Frank M. Butrick and Dolores Butrick v. Commissioner.
Butrick v. Commissioner
Docket No. 4870-70.
United States Tax Court
T.C. Memo 1972-59; 1972 Tax Ct. Memo LEXIS 197; 31 T.C.M. (CCH) 247; T.C.M. (RIA) 72059; March 1, 1972, Filed. Raymond E. Cookston, Union Commerce Bldg., Cleveland, Ohio, for the petitioners. J. Edward Friedland, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' income tax: Year
Deficiency
1966
$4,302.58
1967
532.75
Due *198 to petitioners' concessions, the only issue presented for decision is whether petitioners sustained a deductible loss in 1966 with respect to transactions involving their personal residence. Finding of Fact Some of the facts are stipulated and are found accordingly. Petitioners resided in Oxford, Michigan, at the time their petition herein was filed. Joint returns for the years 1966 and 1967 were timely filed with the district director at Cleveland, Ohio. On or about November 17, 1960, petitioners entered into a land contract with Charles H. Sharp (hereinafter referred to as "Sharp") and his wife for the purchase of residential property located at 2961 Fairfax Road, Cleveland Heights, Ohio (hereinafter sometimes referred to as the "Fairfax property"). The contract provided for a purchase price of $43,500, of which $1,500 was paid upon execution. The balance was payable, with interest at 7 percent per annum from December 1, 1960, in monthly installments, which were increased annually from $300 in 1961 to $450 in 1964 and thereafter and which were to be applied first to interest and then to principal. The contract further provided that petitioners were to pay to the sellers the *199 real estate taxes and insurance premiums in monthly installments; in the event of loss, the proceeds of the insurance were authorized to be paid to the sellers, who were required to apply the same to the reduction of the indebtedness or the restoration and repair of the property damaged. All risk of loss of the premises was to be borne by the petitioners. The petitioners, as buyers, were to carry public liability insurance at their expense. Possession of the premises was to be given to petitioners on December 1, 1960, and title was to be delivered to petitioners upon the full payment of the purchase price. The contract contained provisions, in the event of default by petitioners, for the acceleration of maturity of the installment payments, foreclosure, and termination of the petitioners' rights thereunder. The contract referred to a first mortgage on the property held by Shaker Savings Association (hereinafter "Shaker") and provided further that "[buyers] agree that they will comply with all the terms and provisions of said first mortgage except with respect to making payments pursuant thereto." The Fairfax property was purchased for and used continuously as a residence by petitioners *200 until late 1966 or early 1967. During their period of occupancy, petitioners made a number of expenditures for improvements, alterations, and, to a minor degree, repairs. These expenditures totalled $23,881.99. The first mortgage on the property secured a loan of $52,000 obtained by the Sharps from Shaker on May 17, 1960. Said mortgage also covered a second parcel of property (hereinafter referred to as the "Westchester property"). Pursuant to an informal understanding among Shaker, Sharp, and petitioners, 248 payments by petitioners on behalf of the Sharps were made to a "collection account" opened with Shaker on December 27, 1960. These payments were equal to the installment payments called for under the contract plus the additional amounts with respect to real estate taxes and insurance on the Fairfax property. The contract payments were then applied to satisfy the Sharps' obligation under the first mortgage. Some time subsequent to December 27, 1960, and without petitioners' knowledge, payments made by petitioners to the aforementioned collection account were transferred to the Sharps' personal savings account instead of being applied against the first mortgage. Petitioners *201 made payments on the land contract totalling $32,982.00. [1] The balance on the outstanding principal under the land contract was $29,573.85 after petitioners' last payment in or about June, 1966. At that time, the unpaid balance of the amount secured by the first mortgage was approximately $48,000. On August 5, 1965, Shaker notified the Sharps and petitioners that "[due] to the failure of the parties involved *202 to perform, Shaker Savings Association is no longer handling the collection of the above subject account." All subsequent payments were then made directly to the Sharps. On June 1, 1966, Shaker initiated foreclosure proceedings on the Fairfax and Westchester properties due to the alleged default of the Sharps on the aforementioned mortgage; the Sharps and petitioners were named as defendants. The Sharps' answer to Shaker's allegations was that the Fairfax property had been sold to petitioners and that the latter were supposed to make the necessary payments to Shaker on their behalf. Petitioners cross-claimed against the Sharps for breach of contract, alleged damages of $25,226.15 (comprised of improvements of $11,300.00 and payments on principal of $13,926.15), and an equitable interest in the Fairfax property of a like amount. The Sharps, in answer to petitioners' allegations, alleged that petitioners had breached the land contract on July 1, 1966 and asked that the remaining principal of $31,010.51 be declared due and payable in accordance with the contract. [2]
*203 On October 24, 1966, the Sharps and petitioners entered into an agreement entitled "Mutual Release of All Claims and Demands," which also referred specifically to all claims under the land contract and recited that that contract was "cancelled and rescinded." The Fairfax property was sold to a noninterested third party, and, on February 3, 1967, petitioners received in cash or credits the sum of $8,000 from the escrow agent; part of the consideration received was a cognovit note from the Sharps for $556.40. The litigation was then dismissed with respect to the claims of all the parties asserted therein. On their 1966 return, petitioners deducted the interest paid on the deferred purchase price under the land contract, the taxes paid in respect of the Fairfax property, and a loss of $20,845.24, which loss was disallowed by respondent. At trial petitioners increased their claimed loss to $53,183.99, broken down as follows: Payments under the land contract
$32,982.00
Repairs, improvements, and related expenditures
23,881.99
Labor (done by Butrick) 4,320.00
Total
$61,183.99
Less amount received in settlement (8,000.00)
$53,183.99
Opinion Absent *204 the existence of a debt, which petitioners can prove became worthless during the taxable year, petitioners' loss is clearly nondeductible; since a residence is involved, there is no basis for allowing a loss in a "transaction entered into for profit" under section 165(c). Section 262; (C.A. 2, 1941). Indeed, petitioners appear to recognize that this is the case, since, on brief, they rely on the provisions of 249 section 166 [3] to sustain their claim of a deductible nonbusiness bad debt. We think that petitioners' claim in this regard is without merit on several grounds. [4]
*205 In the first place, given the nature of the claims of petitioners, the counterclaims of the Sharps, and the fact that, for aught that appears in this record, both may have had some validity, petitioners had at best an unliquidated and unadjudicated claim for damages. This is insufficient to acquire the status of a debt for tax purposes. (C.A. 6, 1930); ; ; . Moreover, the failure of petitioners to establish the Sharps' liability for an amount in excess of the $8,000 settlement supports the conclusion that no debt in any greater amount existed. (C.A. 9, 1964); . See also . [5]
*206 In the second place, even assuming the Sharps were indebted to petitioners, it is inescapable that any claim thereon was an integral part of a transaction involving a personal residence. As a result, any loss with respect thereto is a nondeductible personal expenditure and the provisions of section 166 are inapplicable. Section 262. Cf. (C.A. 4, 1957). See . Finally, the record herein does not contain sufficient evidence to sustain petitioners' burden of proof that the debt, if it existed, became worthless in the taxable year in question. The fact that petitioners chose to make a settlement of their claims with the Sharps does not, in and of itself, establish a loss; proof is still required that any additional indebtedness that existed was worthless. ; Petitioners seek to support their claim of worthlessness on the ground that they settled for such a small amount in comparison to the amount originally asserted in their actions against the Sharps because, based upon what their *207 lawyer told them, they did not think they could collect any more than this amount from the Sharps. It has long been established that a subjective determination of a debtor's inability to pay, regardless of the honesty of a taxpayer's belief, is insufficient to prove the necessary element of worthlessness in the bad debt arena. ; , affirmed per curiam, - F. 2d - ( C.A. 9, 1970, ); . The fact that petitioners' lawyer advised them that collection in full from the Sharps was unlikely is insufficient in the absence of evidence as to the facts underlying that opinion. . , relied upon by petitioners, is clearly distinguishable on its facts. In that case, the insolvent estate of a vendor of real estate was ordered by the probate court to convey title to the purchaser-taxpayer, subject to the first mortgage placed on the property by the deceased vendor. The action by *208 the probate court created a legally enforceable obligation for a sum certain in favor of the taxpayer. Moreover, it was established that the estate of the vendor 250 was insolvent. In the instant case, we are faced with an obligation of questionable validity and uncertain amount, a variety of counterclaims by the petitioners against the Sharps, a settlement in full of all claims between the parties, and insufficient evidence of the inability of the Sharps to pay any amount beyond that called for by the settlement to which petitioners might otherwise have been entitled. Decision will be entered for the respondent. Footnotes
1. The record does not reveal what portion of these payments represented interest on the deferred amount of the purchase price or taxes and insurance on the Fairfax property. As a consequence, and additionally because the record does not permit a finding as to what expenditures were actually made for repairs, we have made no finding of fact as to petitioners' cost basis in the Fairfax property. Petitioners also claimed the sum of $4,320 as part of the cost basis; since this amount represents the estimated value of the services of petitioner, Frank M. Butrick, in making alterations, improvements, and repairs, it cannot be considered part of any cost basis. . See also .↩
2. The apparent discrepancy between what petitioners alleged to be the principal remaining under this contract ($43,500.00 less $13,926.15) and the Sharps' assertion of $31,010.51 is not explained by the record.↩
3. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. * * * ↩
4. In their reply brief, petitioners for the first time argue that the loss might be allowable under section 166(f). Putting aside the question of the properiety of raising new issues and arguments at such a late stage, we find nothing in this record which even remotely suggests the applicability of that section.↩
5. At trial, petitioners raised the possibility that the Sharps had "defrauded" them by not applying the petitioners' payments against the payments due Shaker under the Sharps' first mortgage. In the absence of any proof that the petitioners or their representatives were willfully deceived and that this deception gives rise to a legally enforceable obligation for a sum certain running from the Sharps to petitioners, we are constrained to reject this "claim" as a basis for establishing the existence of a debt. See ; .↩